**F I L E D**

UNITED STATES COURT OF APPEALS

**December 16, 2005**

FOR THE TENTH CIRCUIT

CACHE VALLEY ELECTRIC
COMPANY, formerly known as CVE
Construction, Inc., United States of
America, ex rel,

      Plaintiff-Appellee,

  v.

METRIC CONSTRUCTION
COMPANY, a California corporation;
SAFECO INSURANCE COMPANY
OF AMERICA, a Washington
corporation,

      Defendants-Appellants.

No. 04-4303
(D.C. No. 1:02-CV-67-DB)
(D. Utah)

ORDER AND JUDGMENT[*]

Before **TYMKOVICH, PORFILIO**, and **BALDOCK**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Defendants Metric Construction Company and Safeco Insurance Company of America (collectively referred to herein as "Metric") appeal from a judgment of the Utah federal district court ruling after bench trial in favor of Cache Valley Electric Company (Cache Valley) on a portion of Metric's counterclaim for breach of contract.[1] We affirm.

## FACTS

Metric entered into a construction contract with the United States Department of the Army for the construction of certain deployable medical systems ("DEPMEDS") at Hill Air Force Base. Cache Valley entered into an electrical subcontract with Metric for the DEPMEDS project. The subcontract was prepared by Metric, and reviewed and revised by Cache Valley before signature.

---

[1] Metric further purports to appeal from the district court's denial of its motion for summary judgment on Metric's counterclaim. As Metric acknowledges in its briefing in this court, however, the district court never expressly ruled on Metric's summary judgment motion. Aplt. Br. at 14 n.14. Instead, it implicitly denied the motion by proceeding to trial. Any summary judgment factual issues have now been resolved through the bench trial in this case. *See Snyder v. City of Moab*, 354 F.3d 1179, 1184 n.2 (10th Cir. 2003). Furthermore, any determination of law resulting in a denial of summary judgment merged into the district court's ultimate legal findings made following the bench trial. Thus, we review only the final judgment in this case, and not the district court's interlocutory denial of summary judgment.

The total amount due under the subcontract, with written approved change orders, was $2,045,798.98. Of this amount, Metric paid Cache Valley $1,839,128.70, leaving a balance due of $206,670.28. Cache Valley sued Metric pursuant to the Miller Act, 40 U.S.C. §§ 3131-3134, for breach of the subcontract, seeking to recover the balance allegedly due.[2] Metric counterclaimed, asserting setoffs against Cache Valley for failure to provide timely submittals as required by the subcontract, and for the cost of providing electrical construction quality control (CQC) personnel on the project. The parties stipulated to the allegations of Cache Valley's complaint at trial, leaving only the setoffs sought in Metric's counterclaim at issue.

Metric sought two types of setoff. First, it claimed that Cache Valley was liable for stipulated damages for its failure to timely provide various submittals required by the subcontract. The district court ruled in Metric's favor on this portion of the counterclaim. Cache Valley has not cross-appealed from this aspect of the district court's decision.

Second, Metric sought to set off the sum of $177,820.45, allegedly due from Cache Valley as reimbursement to Metric for the cost of providing electrical

---

[2]     At the time the bond and associated contract were executed, the Miller Act was codified at 40 U.S.C. §§ 270a-270e. This order and judgment will cite to the statute's current codification.

CQC.  Cache Valley's bid on the project had specifically excluded CQC costs, but Metric contends that the subcontract itself made Cache Valley responsible for these costs.

The following provisions of the subcontract are specifically relevant to Metric's claim concerning CQC costs:

Article 1 describes the documents included within the contract between Metric and Cache Valley.  It includes the General Contract between Metric and the Department of the Army as part of the contract documents.

Article 32 describes a number of items specifically excluded from the subcontract.  CQC costs are not included among the excluded items.

Article 33 describes items specifically included within the subcontract.  Subsection (S) of Article 33 is chiefly at issue in this case and reads in its entirety:  "CQC Personnel per Section 01451 Paragraph 3.4.3.C including but not limited to all wages, salaries, housing, travel, and all other related expenses."  Aplt. App., Vol. I, at 39.   The parties agree that the language "per Section 01451 Paragraph 3.4.3.C," refers to a paragraph in the General Contract between Metric and the Department of the Army.  That paragraph reads as follows:

> In addition to CQC personnel specified elsewhere in the contract, the Contractor shall provide as part of the CQC organization specialized personnel to assist the CQC System Manager for the following areas:  electrical, mechanical, civil, structural, and architectural.  These individuals shall be directly employed by the prime Contractor; be responsible to the CQC System

Manager; be physically present at the construction site during work on their areas of responsibility; have the necessary education and/or experience in accordance with the experience matrix listed within. These individuals shall have no other duties other than quality control.

*Id.* at 43. Subsection c of Paragraph 3.4.3 specified the experience matrix qualifications for electrical CQC personnel.

The district court determined that Article 33(S) was ambiguous as a matter of law concerning Cache Valley's responsibility for CQC costs. It further determined, based on the evidence presented concerning the conduct of the parties and their intent, that Cache Valley had never affirmatively agreed to pay for the CQC costs. It therefore denied Metric a setoff for these costs.

## ANALYSIS

### 1. Standard of review

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. . . . Thus, we will reverse the district court's finding only if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001) (quotation marks and citation omitted).

The Miller Act does not itself provide jurisdiction for Metric's counterclaims against Cache Valley. *See generally* 40 U.S.C. § 3133. Metric relied instead on diversity jurisdiction. *See* Aplt. App., Vol. I, at 13 (invoking 28 U.S.C. § 1332). When sitting in diversity jurisdiction, this court applies the most recent version of contract law articulated by the forum state's highest court. *First Am. Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1172 (10th Cir. 2005).

## 2. Existence of ambiguity

The first issue that we must resolve is whether the subcontract is ambiguous concerning Cache Valley's responsibility for paying CQC costs. Whether a contract is ambiguous is a question of law. *Nielsen v. Gold's Gym*, 78 P.3d 600, 601 (Utah 2003). A contract "is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) (quotation omitted).

The parties disagree concerning what evidence is relevant to the determination of ambiguity. Metric contends that since the subcontract contains an integration clause, Aplt. App., Vol. I, at 38 (Art. 23), we may not look beyond the four corners of the contract to determine whether any ambiguity exists. Cache Valley responds that extrinsic evidence may be used to illuminate the context in

which a contract was executed, thereby assisting the court in determining whether the contract is in fact ambiguous. We need not determine whether resort to extrinsic evidence would be permissible in this case to determine ambiguity, however, because we agree with the district court that the contract is ambiguous *on its face* concerning the responsibility for payment of CQC costs.

First, contrary to Metric's assertions (*see* Aplt. Br. at 18), Article 33, labeled "Inclusions," does not simply identify items for which Cache Valley is to be responsible. At least one of the items, Article 33(E), describes *Metric's* undertakings or responsibilities.[3] *See* Aplt. App., Vol. I, at 39. Other items unambiguously describe responsibilities of Cache Valley. *See id.* Article 33(A), (B), (C), (D). Still others appear to be neutral, identifying applicable Specification Sections or Contract Amendments that are to be made part of the subcontract. *See id.* Article 33(F), (G). While the entire, latter portion of Article 33, Articles 33(H) - (T), *could* be read as an itemized list of Cache Valley's responsibilities under the subcontract, nothing in Article 33 expressly delineates these items as Cache Valley's responsibility. As the district court noted, Article 33(S) is "silent respecting who is responsible for paying the CQC costs, time of payment, method of payment, amount of payment or other limitation. It is

---

[3] It states "Contractor desires to accelerate the project schedule and will make every attempt to do so but, due to the uncertainties inherent in dealing with the Department of the Army, this may not be possible." Aplt. App., Vol. I, at 39.

-7-

grammatically incomplete, indefinite in its application and susceptible to varying interpretations." Aplt. App., Vol. I, at 126.

Further ambiguities are created by the reference to Section 01451 Paragraph 3.4.3.C of the General Contract between Metric and the Department of the Army, which requires Metric to "*provide . . . specialized [CQC] personnel*" who are to be "*directly employed*" by Metric. *Id.* at 43 (emphasis added). "Directly employed" suggests that the Department of the Army may have intended Metric to be responsible for employing and paying CQC personnel. Thus, we agree with the district court that the subcontract is ambiguous concerning the payment of CQC expenses.

### 3. Resolution of ambiguity

Since the contract is ambiguous, the district court properly admitted extrinsic evidence of the parties' intent in order to resolve the ambiguity, making interpretation of the contract a factual matter. *Gold's Gym*, 78 P.3d at 601. We review the district court's factual findings on this subject, made after a bench trial, for clear error. *Keys Youth Servs.*, 248 F.3d at 1274.

The district court found that

[Cache Valley] had excluded the CQC costs from its original bid and at no time thereafter did it affirmatively agree to pay those costs. This finding is buttressed by the conduct of the parties during the course of performance of the subcontract. Metric never billed [Cache Valley], never gave written notice of a Subcontract withhold, nor made other demand for reimbursement of the CQC costs until

-8-

early May of 2002, eight months after substantial completion of the DEPMEDS project. Metric hired and paid all CQC personnel during the course of the project and near project completion, hired a [Cache Valley] employee to perform the electrical CQC function and paid [Cache Valley] for that person's time rather than requiring [Cache Valley] to stand the cost. In this regard, the Court finds the testimony of Mr. Dameworth, [Cache Valley's] Vice President, to the effect that Metric paid for all of the time its employee devoted to CQC functions to be more credible than evidence offered by Metric to the contrary.

Aplt. App., Vol. I, at 126-27.

These factual findings are not clearly erroneous. The testimony at trial concerning what occurred during contract negotiations was ambiguous. We presume, however, that the district court resolved any factual disputes, as it was permitted to do, in favor of the prevailing party, Cache Valley. In particular, "evaluating the credibility of witnesses is a matter left to the finder of fact." *United States v. Anderson*, 189 F.3d 1201, 1207 (10th Cir. 1999).

John Laub, Cache Valley's president, negotiated the final subcontract on behalf of Cache Valley with Sidney Pehrson of Metric. He and Mr. Pehrson went over the draft contract together. Mr. Laub stated that he did not discuss Article 33(S) with Mr. Pehrson, and did not understand that Cache Valley would be obligated to pay the CQC expenses. Mike Dameworth, Cache Valley's vice president, testified that Cache Valley never agreed to pay the CQC expenses.

Mr. Pehrson testified that he went through the inclusions in Article 33 with Mr. Laub in detail. At best, however, he could only state that "Mr. Laub *did not*

*disagree* to those costs." Aplt. App., Vol. II, at 169 (emphasis added). Thomas Miller, Metric's president, stated that the CQC provision was included within the subcontract because "it was something that *we wanted* Cache Valley to do." *Id.* at 239-40 (emphasis added). While there was testimony going both ways as to the expressions of intent at the time of contract formation, the district court permissibly resolved the ambiguity in favor of Cache Valley.

In resolving the ambiguity in the contract language, the district court relied heavily on the parties' subsequent course of performance. In particular, it found Metric's failure to bill Cache Valley for the CQC expenses until after substantial completion suggested that it was understood that Cache Valley would not be responsible for reimbursing Metric for the CQC costs. *See WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002) ("If a contract is ambiguous, the court may consider the parties' actions and performance as evidence of the parties' true intention."). Since the CQC expenses amounted to more than five percent of the contract price, the district court evidently concluded that Metric's lack of diligence made Cache Valley's version of the parties' intent more likely than that presented by Metric. In sum, in reviewing the district court's determination of the factual issues of this case, we are not left with a definite and firm conviction that it reached the wrong conclusions or that its findings are unsupported in the record.

The judgment of the district court is therefore AFFIRMED.

Entered for the Court


Bobby R. Baldock
Circuit Judge